47 A.3d 1190

**Barbara Lichtman TAYAR, Appellee**

v.

**CAMELBACK SKI CORPORATION, INC. and Brian Monaghan, Appellants.**

Supreme Court of Pennsylvania.

Argued May 11, 2011.

Decided July 18, 2012.

386

Hugh M. Emory, Ryan, Emory & Ryan, L.L.P., Paoli, for Camelback Ski Corporation, Inc. and Brian Monaghan.

Barbara Axelrod, Philadelphia, James Emmett Foerstner Jr., Beasley Law Firm, L.L.C., for Barbara Lichtman Tayar.

Marcy L. Colkitt, Colkitt Law Firm, P.C., Andrew J. Kennedy, Indiana, for Appellee Amicus Curiae, Sarah Scott.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *OPINION*

Justice TODD.

In this appeal by allowance, we address, *inter alia,* whether it is against public policy to release reckless behavior in a pre-injury exculpatory clause. After careful review, we conclude that releasing recklessness in a pre-injury release is against public policy, and so we reverse the Superior Court in part, affirm in part, and remand.

### *I. Background*

Appellant Camelback Ski Corporation, Inc. ("Camelback") operates a ski resort in Tannersville, Pennsylvania that offers various winter activities, including skiing and snow tubing. Before permitting its patrons to enjoy snow tubing, Camelback requires each customer to sign a pre-printed release form ("Release"),[1] which states, in relevant part:

CAMELBACK SNOW TUBING

ACKNOWLEDGMENT OF RISKS AND AGREEMENT NOT TO SUE

THIS IS A CONTRACT–READ IT

I understand and acknowledge that snow tubing, including the use of lifts, is a dangerous, risk sport and that there are inherent and other risks associated with the sport and that all of these risks can cause serious and even fatal injuries.

---

1. A similarly-worded release was contained on the back of Camelback's lift tickets. No issue concerning the lift ticket release has been raised.

I understand that part of the thrill, excitement and risk of snow tubing is that the snow tubes all end up in a common, runout area and counter slope at various times and speeds and that it is my responsibility to try to avoid hitting another snowtuber and it is my responsibility to try to avoid being hit by another snowtuber, but that, notwithstanding these efforts by myself and other snowtubers, there is a risk of collisions.

\* \* \*

IN CONSIDERATION OF THE ABOVE AND OF BEING ALLOWED TO PARTICIPATE IN THE SPORT OF SNOWTUBING, I AGREE THAT I WILL NOT SUE AND WILL RELEASE FROM ANY AND ALL LIABILITY CAMELBACK SKI CORPORATION IF I OR ANY MEMBER OF MY FAMILY IS INJURED WHILE USING ANY OF THE SNOWTUBING FACILITIES OR WHILE BEING PRESENT AT THE FACILITIES, EVEN IF I CONTEND THAT SUCH INJURIES ARE THE RESULT OF NEGLIGENCE OR ANY OTHER IMPROPER CONDUCT ON THE PART OF THE SNOWTUBING FACILITY.

Release (Exhibit A to Appellants Motion for Summary Judgment) (R.R. at 14a).[2]

Camelback offers its customers two different methods of snow tubing. One set of snow tubing slopes grants snow tubers relatively uncontrolled access down the mountain and deposits them in a common receiving area. Alternatively, customers can enjoy two snow tubing slopes identified as "family" tubing slopes. These family tubing slopes are separated from the other snow tubing slopes, and the flow of snow tubers is controlled by a Camelback employee, who discharges them from the summit once the previous snow tubers have cleared the receiving area at the bottom. The receiving area for the family tubing slopes is segregated from the common receiving area connected to the other slopes.

2. Although the language of the Release is taken verbatim from the record, the Release is not reproduced with the precise font sizes and form.

On December 20, 2003, Appellee Barbara Lichtman Tayar ("Tayar") and her family visited Camelback's facility in the early afternoon.[3] After observing the snow tubing slopes for a period of time, Tayar and her family decided to join in, and, pursuant to Camelback's requirement, Tayar signed the Release. Tayar and her family elected to use the family tubing slopes, and completed four successful runs down the mountain, with Appellant Brian Monaghan ("Monaghan"), a Camelback employee, releasing them from the summit safely each time.

Tayar's fifth adventure down the mountain began just as the others, with Monaghan giving her a slight push to start her down the slope. Once she reached the receiving area at the bottom of the slope, however, Tayar exited her snow tube and was immediately struck by another snow tuber coming down the family tubing slope. Camelback employees rushed to assist Tayar out of the receiving area, when yet another snow tuber narrowly missed striking her. At this point, several Camelback employees were yelling and gesturing up the mountain to Monaghan to stop sending snow tubers down the slope until they could safely remove Tayar from the receiving area. As a result of the collision, Tayar suffered multiple comminuted fractures of her right leg, for which she underwent surgery and required two metal plates and 14 screws to stabilize her ankle.

Tayar filed a complaint against Camelback and Monaghan (collectively "Appellants") in the Court of Common Pleas of Monroe County on January 6, 2005. Appellants filed an answer and new matter, and thereafter moved for summary judgment, asserting Tayar's claims against Camelback and Monaghan were barred by the Release. On March 31, 2006, the trial court granted Appellants' motion, reasoning the Release covered Camelback and thereby released it from any liability associated with Tayar's injuries. Additionally, the court determined that it did not need to address whether the Release encompassed Monaghan in his personal capacity because, in any event, the release printed on the lift ticket

---

**3.** The factual background described is as developed at the summary judgment stage of the proceedings.

relieved Monaghan of liability. *See supra* note 1. Further, while the court concluded the evidence demonstrated Monaghan acted negligently by sending snow tubers down the mountain too early, it did not suggest he acted recklessly or with gross negligence. Thus, the trial court determined the Release and lift ticket relieved Appellants of liability and compelled entry of summary judgment in their favor. Tayar appealed to the Superior Court.

On appeal, a three-judge panel affirmed in a divided decision. Thereafter, Tayar requested the Superior Court rehear the matter *en banc*, and her request was granted. Upon rehearing, the *en banc* Superior Court reversed the trial court in a 5–4 decision. *Tayar v. Camelback Ski Corp., Inc.*, 957 A.2d 281 (Pa.Super.2008). Construing the Release strictly against Appellants, the majority concluded the Release did not encompass Monaghan in his personal capacity because he failed to demonstrate the Release exculpated him with the "greatest particularity." *Id.* at 289. As the Release did not mention employees, but only Camelback, the majority reasoned that reading the Release to encompass Monaghan in his personal capacity would require inserting language into the Release. The majority also determined that the Release encompassed only negligent conduct because its language was not specific enough to release acts of greater culpability: the Release "had to explicitly state that the releasor was waiving claims based upon allegations of recklessness and intentional conduct" in order for such conduct to be validly released. *Id.* at 292. Thus, the majority determined the Release was valid only with respect to Camelback, and relieved Camelback from liability for only negligent conduct. As the majority further found there existed a material question concerning whether Monaghan acted recklessly or negligently, the majority concluded the trial court erred by entering summary judgment in favor of Appellants, and remanded for further proceedings.

Judge Mary Jane Bowes authored a Dissenting Opinion, which was joined by Judge, now Justice, Orie Melvin, as well as Judges John T. Bender and Susan Peikes Gantman. Judge Bowes concluded the Release did release Monaghan from

liability, reasoning a corporation may not act but through its employees, and noting Monaghan was acting within the scope of his employment when he sent the snow tubers down the mountain. Moreover, Judge Bowes concluded the Release was not against public policy and encompassed reckless conduct, as it referred to "negligence or any other improper conduct." *Id.* at 297 (Bowes, J., dissenting) (quoting Release). In any event, Judge Bowes viewed Monaghan's actions as nothing more than garden variety negligence, which was unquestionably covered by the Release. Accordingly, Judge Bowes would have affirmed the trial court's grant of summary judgment in favor of Appellants.

■ Appellants petitioned this Court for review, which we granted to address three issues: (1) whether employees are encompassed by a release which only mentions the employer; (2) whether public policy permits releases of reckless behavior; and (3) if so, the language necessary to achieve such a release.[4] *Tayar v. Camelback Ski Corp., Inc.*, 607 Pa. 460, 8 A.3d 299 (2010) (order).

4. In his Concurring and Dissenting Opinion ("CODO"), Justice Baer contends our review of the question of whether a release for reckless conduct is against public policy is infirm because the underlying issue of Monaghan's recklessness was not properly before the Superior Court. *See* CODO at 5–6. We disagree. Tayar raised the issue of whether there was a factual question regarding Monaghan's recklessness in her response to Appellants' summary judgment motion, *see* Brief in Opposition to Defendants' Motion for Summary Judgment at 13, and in her Pa.R.A.P. 1925(b) statement, *see* Plaintiff's Statement of Matters Complained of on Appeal, 5/11/06, at 1–2. Further, the issue was fully briefed before the three-judge Superior Court panel, *see* Brief for Appellant at 32–33; Brief for Appellees at 26–28, and the *en banc* panel of that court, *see* Brief for Appellant on Reargument at 37, 42–43; Brief for Appellees on Reargument at 35–36. Accordingly, we find no error in the Superior Court addressing this factual question, and thus no infirmity to our review of the public policy question encompassing that issue.

Justice Baer further contends that, even if he were to assume the issue was preserved, he would find that the Superior Court erred in reversing the trial court's conclusion that the summary judgment record did not present a factual question regarding whether Monaghan's conduct constituted recklessness. *See* CODO at 6–8. Respectfully, we did not grant allowance of appeal in this case to review that fact-intensive aspect of the Superior Court's decision.

## II. Analysis

### A. Does the Release cover employees of Camelback?

Appellants first argue the Superior Court erred by concluding that Monaghan was not covered by the Release. Appellants note that it is well accepted that a corporation may not act but through its employees, and claim the intent of the Release, therefore, was to release both Camelback and its employees, specifically Monaghan. Appellants allege the final phrase of the Release supports this conclusion, as it states that Tayar was releasing claims for injuries caused by negligence or other improper conduct "on the part of the snowtubing facility." Appellants aver that, because Camelback could not act but through its employees, a common sense reading of this statement serves to release employees acting in the course of their employment as well as Camelback itself. Lastly, Appellants note that Monaghan was, in fact, acting within the scope of his employment at the time of Tayar's injury, and, therefore, is indemnified by, and considered the same party as, Camelback for purposes of this suit.

Tayar avers the Release does not shield Monaghan. Tayar notes the Release refers only to "Camelback Ski Corporation," and never mentions employees. She alleges the Release did not describe, or even mention, injuries resulting from acts an employee could commit, contending the Release mentioned only risks inherent to the sport of snow tubing, or dangerous conditions which naturally exist on a snow tubing slope, the minimization and control of which is the responsibility of the property owner, *i.e.*, Camelback. For example, Tayar submits a skier injured by a negligently placed fence or barrier would be subject to the Release, because the placement of fences and barriers is controlled by Camelback itself, not its employees. Tayar argues that the Release's failure to mention employees corresponds to its description of dangers and injuries, as those descriptions referred to situations for which Camelback as the property owner was solely responsible. Further, Tayar contends, because the Release only described naturally occurring dangers and risks, the public was not put on notice that it was releasing Camelback's employees from overt, reckless conduct.

For instance, Tayar argues the Release's reference to the "risk of collisions" pertained to the common receiving area, which was unregulated by Camelback employees, and did not notify the public of a risk of collision due to a Camelback employee sending a snow tuber down the slope too early. She observes that, prior to this matter, Camelback used a different version of the Release, which did specifically mention employees. Yet, Camelback elected to remove all references to employees in the version of the Release at issue here. As such, Tayar claims Camelback made a deliberate decision to remove its employees from the protection of the Release. Additionally, Tayar contends the Release failed to inform the public with the greatest particularity that acts of employees were covered by the Release, asserting this Court would have to read the term "employee" into the Release in order to conclude it bars suits against Camelback employees.

■ In construing exculpatory clauses, we apply the standard set forth in *Topp Copy Prods., Inc. v. Singletary*, 533 Pa. 468, 626 A.2d 98 (1993), which provides that, in order for exculpatory language to be enforceable:

1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing immunity is upon the party invoking protection under the clause.

*Topp Copy*, 533 Pa. at 471, 626 A.2d at 99.

■ In determining whether the Release relieved Monaghan of liability, we begin and end with the generally accepted premise that a corporation can only act through its officers, agents, and employees. *See Weatherly Area Sch. Dist. v. Whitewater Challengers, Inc.*, 532 Pa. 504, 507, 616 A.2d 620, 621 (1992) (noting that governmental agencies, political subdivisions, and private corporations can act only "through real

people—its agents, servants or employees."); *Maier v. Maretti*, 448 Pa.Super. 276, 671 A.2d 701, 707 (1995) (concluding employees, agents, and officers of a corporation may not be regarded as separate parties when acting in their official capacity). Indeed, under the doctrine of vicarious liability, the corporation, not the employee, is liable for acts committed by the employee in the course of employment. *See Travelers Cas. & Sur. Co. v. Castegnaro*, 565 Pa. 246, 252, 772 A.2d 456, 460 (2001) (concluding a principal is liable for the negligent acts and torts of its agents, as long as those acts occurred within the agent's scope of employment).

■ Here, the Superior Court majority concluded that, because Camelback is a separate legal entity, the Release's reference to Camelback did not encompass its employees. The absence of a specific reference to the term "employees" in this circumstance, however, does not alter the basic tenants of corporate law; and we will apply those foundational principles unless there exists express language to the contrary. Here, Tayar does not point to any such express indication that employees are removed from the protection of the Release. Rather, by referring to "Camelback Ski Corporation" and "the snow tubing facility," we conclude the Release expressed with sufficient particularity that it covered the acts of Camelback employees, as Camelback could not act, negligently, improperly, or otherwise, other than through its agents and employees. Further, Monaghan was clearly acting within the scope of his employment when he sent snow tubers down the slope. Accordingly, we conclude the Release encompassed the acts of Camelback employees, and specifically Monaghan.[5]

### B. Does the Release encompass reckless conduct?

■ In addressing whether the Release encompasses reckless conduct, we must first consider the broader question of

---

5. Indeed, were we to conclude otherwise, it would appear to undermine much of the point of such a release from the corporation's perspective. That is, if claims against Monaghan were not barred by the Release (and barred only against Camelback), arguably Camelback nonetheless could be subject to claims of vicarious liability for the acts of Monaghan, and thus potentially exposed to similar liability as if there were no release.

whether it is against public policy for a pre-injury release to relieve a party of liability for reckless conduct. Appellants argue that such releases are enforceable, and do not violate public policy. Citing *Leidy v. Deseret Enter., Inc.,* 252 Pa.Super. 162, 381 A.2d 164 (1977), Appellants assert courts have concluded such releases were contrary to public policy in only four situations: (1) within the employer-employee relationship; (2) where one party is charged with a duty of public service; (3) where the release relieves liability for statutory violations; and (4) where the release limits consequential damages for consumer goods. Appellants submit the instant matter does not involve any of these scenarios, but, rather, concerns a private agreement between individuals relating to their private affairs. Appellants note that, in *Chepkevich v. Hidden Valley Resort, L.P.,* 607 Pa. 1, 2 A.3d 1174 (2010), we stated that recreational sporting activities may be viewed differently in the context of exculpatory agreements, as each party is free to participate, or not, in the activity, and, therefore, is free to sign, or not, the release form. They argue *Valeo v. Pocono Int'l Raceway, Inc.,* 347 Pa.Super. 230, 500 A.2d 492 (1985), is persuasive, as, there, the Superior Court held the language of the release, which relieved the raceway of liability for injuries "whether caused by negligence or otherwise," was sufficient to bar a claim for gross negligence. Appellants claim there is no caselaw which suggests it is against public policy to permit a release of reckless conduct in a private, voluntary, recreational setting.

Second, concerning the specificity of the Release, Appellants aver the absence of the word "reckless" does not invalidate the Release with respect to reckless conduct. On the contrary, Appellants claim the Release contained language sufficient to encompass reckless behavior, as it purported to release Appellants from "negligence or other improper conduct." Appellants contend the instant language is nearly indistinguishable from that involved in *Valeo,* where the Superior Court determined the release prevented a suit based on gross negligence. Additionally, citing *Chepkevich* and *Zimmer v. Mitchell and Ness,* 253 Pa.Super. 474, 385 A.2d 437 (1978), Appellants allege

that phrases such as "any liability" or "any and all liability" have been held to be sufficient to encompass negligent behavior. Therefore, they contend similar language should also encompass recklessness, as, Appellants argue, it would be clear to a reasonable person that such conduct was being released by that language. In the same vein, Appellants assert the phrase "negligence or other improper conduct" encompasses recklessness by reference to "other improper conduct." Indeed, Appellants query what the phrase "other improper conduct" refers to, if not recklessness. Moreover, Appellants note the Release informed Tayar that snow tubes end up in a common runout area at various times and speeds, and that it was her responsibility to avoid collision. Appellants contend, therefore, that Tayar was specifically informed of the risk of suffering her type of injury, and was notified she would not be able to sue Appellants for negligence or other improper conduct, including recklessness.

In response, Tayar argues that, as far back as 1854, this Court has held that a pre-injury exculpatory release which attempts to release grossly negligent conduct will not be enforceable. *See Pennsylvania R.R. Co. v. McCloskey's Adm'rs*, 23 Pa. 526 (1854). Consistent therewith, Tayar notes the Superior Court, in *Behrend v. Bell Tel. Co.*, 242 Pa.Super. 47, 363 A.2d 1152 (1976), *vacated and remanded on other grounds*, 473 Pa. 320, 374 A.2d 536 (1977), held that a provision which purported to limit a telephone company's liability was valid as to negligent acts, but not to conduct found to be willful, malicious, or reckless. Furthermore, Tayar submits both federal courts and courts from other states have determined that exculpatory clauses will not insulate defendants from grossly negligent or reckless behavior, and she contends that these courts agree on this point because to permit such releases would remove any incentive for defendants to adhere to even a minimal standard of care. Specifically, Tayar cites *Hanks v. Powder Ridge Rest. Corp.*, 276 Conn. 314, 885 A.2d 734 (2005), wherein the Connecticut Supreme Court refused to enforce a release purporting to relieve a snow tubing facility of recklessness, reasoning that, otherwise, "recreational opera-

tors would lack the incentive to exercise even slight care, with the public bearing the costs of the resulting injuries." Brief of Appellee at 20. As further support, Tayar notes Section 195(1) of the Restatement (Second) of Contracts states that releases for intentional or reckless conduct are unenforceable as a matter of public policy. In fact, Tayar notes, Appellants were unable to cite to a single decision that upheld a pre-injury release for recklessness. In that regard, Tayar distinguishes the caselaw relied upon by Appellants by noting that those cases, save for *Valeo*, involved releases of negligent behavior and are thus inapposite. Further, even though the *Valeo* court upheld the release as it applied to claims of gross negligence, Tayar observes that the focus of that decision was whether the language of the release was specific enough to release gross negligence, and did not address the public policy concerns of doing so.

Next, Tayar contends that, even if it is not against public policy to release recklessness, the language of the Release was not specific enough to relieve Appellants from liability for her injury. Tayar argues the standard set forth in *Topp Copy*, quoted above, governs the enforceability of exculpatory provisions. Largely echoing her argument concerning whether Monaghan was encompassed by the Release, Tayar submits the Release fails to meet the *Topp Copy* standard because it did not describe, with the greatest particularity, that she was releasing Camelback's employees for any actions, let alone reckless behavior.

. Tayar distinguishes *Zimmer*, relied upon by Appellants. There, a skier was injured when the bindings on his rented skis did not disengage after he crashed coming down the mountain. The release signed by the skier before renting the skis specifically indicated that the bindings on the skis would not release in all situations and were not a guarantee of safety. The court found the release barred the claim against the ski resort because the release specifically described the type of injury suffered by the skier. Tayar argues that, while the release operated to bar the claim against the ski resort in *Zimmer*, here, the Release did not mention the specific harm

and risk at issue, namely, that snow tubers would be sent down the family tubing slope too early and cause a collision. In essence, Tayar argues that the release in *Zimmer* satisfied the *Topp Copy* standard because its language was particular, whereas, here, the language of the Release is too broad and fails to describe the risks with the greatest particularity.[6]

Turning to our analysis, we note that, although exculpatory provisions are generally disfavored, such provisions are enforceable where three conditions are met. First, the clause must not contravene public policy. Second, the contract must be between persons concerning their private affairs. Third, each party must be a free bargaining agent so the contract is not one of adhesion. *Employers Liab. Assur. Corp. v. Greenville Business Men's Ass'n*, 423 Pa. 288, 224 A.2d 620 (1966). Our instant focus is on the first of these three conditions: whether the Release contravenes public policy. In that regard, we note that avoidance of contract terms on public policy grounds requires a showing of overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards. *See Williams v. GEICO Gov't Employees Ins. Co.*, 613 Pa. 113, 32 A.3d 1195 (2011). Indeed, in *Williams*, we noted that public policy was more than a vague goal, stating:

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as

6. An *amicus* brief has been filed by Sarah Scott, who has a petition for allowance of appeal currently pending before our Court which has been held pending resolution of the instant matter. *Scott v. Altoona Bicycle Club*, 437 WAL 2010. Scott generally agrees with Tayar that recklessness may not be released as a matter of public policy, and also submits there is a generally accepted recognition that recklessness constitutes a more severe form of misconduct than ordinary negligence, and, in light of that recognition, many states do not permit releases of reckless behavior. Further, Scott requests that we formally adopt Section 195 of the Restatement (Second) of Contracts, which, Scott contends, would align Pennsylvania with the many states that refuse to enforce exculpatory provisions purporting to release recklessness.

contrary to that policy[.] . . . Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, the Court should not assume to declare contracts . . . contrary to public policy. The courts must be content to await legislative action.

*Id.* at 1200 (internal quotation marks omitted; alterations original). Further, "[i]t is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring." *Id.* (internal quotation marks omitted). The instant public policy question—whether recklessness can be released in a pre-injury exculpatory clause—is one of first impression for our Court.[7]

*Chepkevich* is our most recent analysis of pre-injury releases as they pertain to ski resort facilities. There, the plaintiff was skiing with her six-year-old nephew and asked the lift operator to stop the lift so she and her nephew could board the lift. Although the lift operator agreed to do so, when the lift came behind the plaintiff and her nephew, the operator failed to stop the lift. As a result, the young boy did not board the lift properly and, when the plaintiff tried to help him on to the lift, she fell and injured her shoulder and hip. The plaintiff filed suit against the ski resort, alleging the lift operator was negligent in failing to stop the lift after promising to do so. The trial court granted summary judgment in favor of the ski resort, reasoning that the release signed by the plaintiff prior to her skiing that day barred her suit. Against a public policy challenge, we upheld the release, reasoning that Pennsylvania encourages the sport of skiing,

---

7. We acknowledge that the Superior Court in *Valeo* approved a release that barred claims of gross negligence. However, the court did not cite to any authority supporting that proposition and, critically, did not address the public policy of permitting such a release. In any event, as gross negligence is not implicated in the instant matter, we leave for another day the question of whether a release for gross negligence can withstand a public policy challenge.

and noting our courts previously upheld such releases for negligence.

■■■■■■ *Chepkevich* did not, however, address whether a release for recklessness is against public policy. In ruminating on this question, we first consider where on the spectrum of tortious conduct recklessness falls. At one end of that spectrum, exculpatory clauses that release a party from negligence generally are not against public policy, and are enforceable provided certain criteria are met.[8] *See Chepkevich; Topp Copy; Cannon v. Bresch,* 307 Pa. 31, 35, 160 A. 595, 597 (1932) ("The covenant in this lease against liability for acts of negligence does not contravene any policy of the law."); *Wang v. Whitetail Mountain Resort,* 933 A.2d 110 (Pa.Super.2007) (upholding release for negligence as applied to snow tubing accident); *Nissley, supra* (upholding release to bar negligence claim); *Zimmer, supra* (same). On the other end of the continuum are releases for intentional conduct. It is elementary and foundational to our system of criminal and tort law that parties are not permitted to intentionally harm one another. Accordingly, releases for intentional tortious conduct are likewise prohibited. *See* AMJUR Contracts 286 (collecting cases); Restatement (Second) of Contracts § 195(1) (a term exempting a party from liability for intentional conduct is against public policy); 15 Corbin on Contracts § 85.18 (2003) (stating courts generally do not enforce agreements to exempt parties from tort liability for intentional conduct). Thus, while obviously distinct concepts, whether on this spectrum we conclude recklessness is more akin to intentional conduct, or more like negligence in character, can guide our inquiry.

**8.** As discussed above, these specific criteria are that: (1) the contract language be strictly construed; (2) the contract must state the intention of the parties with the greatest particularity; (3) the language must be construed against the party seeking immunity; and (4) the burden of establishing immunity rests on the party seeking protection under the clause. *Topp Copy,* 533 Pa. at 471, 626 A.2d at 99. As these criteria concern the enforceability of an otherwise facially valid release, and address the sufficiency of language used in the agreement, they are more relevant to the third question granted for review. Thus, we will not address these specific criteria here.

■ Recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence. In *Fitsko v. Gaughenbaugh*, 363 Pa. 132, 69 A.2d 76 (1949), we cited with approval the Restatement (Second) of Torts definition of "reckless disregard" and its explanation of the distinction between ordinary negligence and recklessness. Specifically, the Restatement (Second) of Torts defines "reckless disregard" as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (1965). The Commentary to this Section emphasizes that "[recklessness] must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent." *Id.*, cmt. a. Further, as relied on in *Fitsko*, the Commentary contrasts negligence and recklessness:

> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.... The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the

risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

*Id.,* cmt. g; *see also* AMJUR Negligence § 274 ("Recklessness is more than ordinary negligence and more than want of ordinary care; it is an extreme departure from ordinary care, a wanton or heedless indifference to consequences, an indifference whether or not wrong is done, and an indifference to the rights of others"). Our criminal laws similarly distinguish recklessness and negligence on the basis of the consciousness of the action or inaction. *See* 18 Pa.C.S.A. § 302(b)(3), (4) (providing that a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk," while a person acts negligently when he "should be aware of a substantial and unjustifiable risk").

This conceptualization of recklessness as requiring *conscious* action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct. As a result, we are inclined to apply the same prohibition on releasing reckless conduct as we do for intentional conduct.

This view is supported by the conclusions of courts in other jurisdictions. As Tayar observes in her brief, 28 of our sister states have addressed whether enforcing releases for reckless behavior is against public policy.[9] Brief of Appellee at 16–20.

9. A few states include the term "gross negligence" when concluding actions of greater culpability than that of ordinary negligence may not be released. Yet, in so concluding, these states either cite to cases involving a party's inability to release reckless conduct, or cite to the Restatement (Second) of Contracts § 195(1), which provides that it is against public policy to permit releases of intentional and reckless behavior. *See Moore v. Waller,* 930 A.2d 176 (D.C.App.2007) (in gross negligence case, after surveying other state cases, noting that other courts have generally not enforced exculpatory clauses that limit a party's liability for gross negligence, recklessness, or intentional torts); *Zavras v. Capeway Rovers Motorcycle Club, Inc.,* 44 Mass.App.Ct. 17, 687 N.E.2d 1263 (1997) (in gross negligence case, citing to Restatement (Second) of Contracts § 195); *Alack v. Vic Tanny Int'l of Mo.,* 923 S.W.2d 330 (Mo.1996) (concluding culpable actions greater than ordinary negligence may not be released); *Adams v. Roark,* 686 S.W.2d 73 (Tenn.1985) (discussing gross negligence, but citing to Restatement (Second) of Contracts § 195); *Smith v. Golden Triangle Raceway,* 708

Of those 28 states, only 2 permit recklessness to be released.[10] Of the other 26 states, 23 have determined that recklessness may not be released, and the majority of those cases involved voluntary recreational activities.[11] The remaining 3 states have concluded that, not only is it against public policy to release recklessness, but also that releases of negligence will not be enforced.[12] Accordingly, the overwhelming majority of our sister states find releases for reckless conduct are against public policy. *See generally* Restatement (Second) of Contracts § 195(1) ("A term exempting a party from tort liability

S.W.2d 574 (Tex.Ct.App.1986) (discussing gross negligence, but citing to Restatement (Second) of Contracts § 195).

**10.** *See Murphy v. North American River Runners, Inc.,* 186 W.Va. 310, 412 S.E.2d 504, 510 (1991) (in the context of white water rafting, noting a general clause in a pre-injury exculpatory agreement will not be construed to release reckless behavior, unless circumstances indicate that was the plaintiff's intention); *L. Luria & Son, Inc. v. Honeywell, Inc.,* 460 So.2d 521 (Fla.Dist.Ct.App.1984) (dismissing all claims but those involving intentional torts or fraud on the basis of release).

**11.** *See Barnes v. Birmingham Int'l Raceway, Inc.,* 551 So.2d 929 (Ala. 1989) (raceway); *Kane v. National Ski Patrol System, Inc.,* 88 Cal. App.4th 204, 105 Cal.Rptr.2d 600 (2001) (ski resort); *Chadwick v. Colt Ross Outfitters, Inc.,* 100 P.3d 465 (Colo.2004) (hunting); *McFann v. Sky Warriors, Inc.,* 268 Ga.App. 750, 603 S.E.2d 7 (2004) (simulated aerial combat); *Laeroc Waikiki Parkside, LLC v. K.S.K. (Oahu) Ltd. Partnership,* 115 Hawai'i 201, 166 P.3d 961 (2007) (construction contract); *Falkner v. Hinckley Parachute Ctr., Inc.,* 178 Ill.App.3d 597, 127 Ill.Dec. 859, 533 N.E.2d 941 (1989) (parachuting); *Butler Mfg. Co. v. Americold Corp.,* 835 F.Supp. 1274 (D.Kan.1993) (applying Kansas law) (fire alarm installation); *Wolf v. Ford,* 335 Md. 525, 644 A.2d 522 (1994) (action against investment firm); *Lamp v. Reynolds,* 249 Mich. App. 591, 645 N.W.2d 311 (2002) (motorcycle racetrack); *Yang v. Voyagaire Houseboats, Inc.,* 701 N.W.2d 783 (Minn.2005) (houseboat rentals); *New Light Co., Inc. v. Wells Fargo Alarm Serv.,* 247 Neb. 57, 525 N.W.2d 25 (1994) (fire alarm installation); *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 901 A.2d 381 (2006) (skateboarding park); *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (Ct.App.1992) (fire alarm installation); *Bowen v. Kil–Kare, Inc.,* 63 Ohio St.3d 84, 585 N.E.2d 384 (1992) (stock-car race); *Schmidt v. United States,* 912 P.2d 871 (Okla.1996) (horseback riding); *K–Lines, Inc. v. Roberts Motor Co.,* 273 Or. 242, 541 P.2d 1378 (1975) (products liability with respect to truck); *Kellar v. Lloyd,* 180 Wis.2d 162, 509 N.W.2d 87 (App.1993) (raceway); *Milligan v. Big Valley Corp.,* 754 P.2d 1063 (Wyo.1988) (ski race); *see also supra* note 9.

**12.** *Hanks, supra* (Conn.) (snow tubing); *Dalury v. S–K–I, Ltd.,* 164 Vt. 329, 670 A.2d 795 (1995) (skiing); *Hiett v. Lake Barcroft Cmty. Ass'n, Inc.,* 244 Va. 191, 418 S.E.2d 894 (1992) (triathlon).

for harm caused *intentionally or recklessly* is unenforceable on grounds of public policy." (emphasis added)); 15 Corbin on Contracts § 85.18 (2003) (stating courts generally do not enforce agreements to exempt parties from tort liability for intentional or reckless conduct); 8 S. Williston, Contracts § 19.24 (1998) ("An attempted exemption from liability for a future intentional tort or crime or for a future willful or grossly negligent act is generally held void."). Moreover, federal courts purporting to apply Pennsylvania law have barred the enforcement of releases for reckless behavior.[13] Similar to our assessment above, these jurisdictions have reasoned that recklessness is more akin to intentional conduct, as recklessness, in contrast to negligence, requires conscious action rather than mere inadvertence. Accordingly, they conclude that permitting recklessness would remove any incentive for parties to act with even a minimal standard of care.

We agree. As illustrated above, were we to sanction releases for reckless conduct, parties would escape liability for consciously disregarding substantial risks of harm to others; indeed, liability would be waivable for all conduct except where the actor specifically intended harm to occur. There is near unanimity across jurisdictions that such releases are unenforceable, as such releases would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct. *See Hall v. Amica Mut. Ins. Co.*, 538 Pa. 337, 347–48, 648 A.2d 755, 760 (1994). We therefore conclude that, even in this voluntarily recreational setting involving private parties, there is a dominant public policy against allowing exculpatory releases of reckless behavior, which encourages parties to adhere to minimal standards of care and safety.

13. *See Valley Forge Con. & Visitors v. Visitor's Serv.*, 28 F.Supp.2d 947, 950 (E.D.Pa.1998) (finding Pennsylvania would not apply an exculpatory clause to preclude recovery for willful or wanton misconduct); *Fidelity Leasing Corp. v. Dun & Bradstreet, Inc.*, 494 F.Supp. 786, 789 (E.D.Pa.1980) (finding exculpatory clause in Pennsylvania would not insulate a defendant from liability for gross negligence or recklessness); *Public Serv. Enter. Group, Inc. v. Phila. Elec. Co.*, 722 F.Supp. 184, 205 (D.N.J.1989) (finding that in Pennsylvania an exculpatory clause would not limit liability for grossly negligent, willful, or wanton behavior).

### III. Conclusion

Accordingly, we reverse the Superior Court's order in part, affirm in part, and remand. We reverse the order of the Superior Court to the degree it concluded that Monaghan was not covered by the Release. We affirm the order to the degree it reversed the grant of summary judgment on the basis that the Release did not bar claims based on reckless conduct, and remanded for further proceedings; on this latter point, we are affirming on the alternative basis that, to the degree it released reckless conduct, the Release was against public policy.[14]

Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices SAYLOR and McCAFFERY join the opinion.

Justice EAKIN files a concurring and dissenting opinion.

Justice BAER files a concurring and dissenting opinion.

Justice EAKIN, concurring and dissenting.

I agree with the majority that reversal of summary judgment is appropriate because the release in question did not bar claims based on reckless conduct, as opposed to negligence. Accordingly, there is a question regarding whether the conduct was reckless; as the majority notes, to the degree the release barred claims based on recklessness, it was against public policy. However, I would affirm the Superior Court's determination that the release did not cover employees of Camelback Ski Corporation. I would conclude, based on the absence of reference to employees or agents of the corporation, that Camelback employee Monaghan was not covered by the release.

14. In light of this conclusion, we need not address Tayar's additional contention concerning how specific language in a release must be in order to cover recklessness.

Ambiguous language in an exculpatory contract is to be construed against the party seeking immunity from liability. *See Topp Copy Products, Inc. v. Singletary,* 533 Pa. 468, 626 A.2d 98, 99 (1993). Here, I believe the Superior Court properly concluded the premise that a corporation can act only through its officers and employees was inapposite. As the court noted, "[a] corporation is a separate, fictional legal person distinct from its shareholders or employees[,]" *Tayar v. Camelback Ski Corp., Inc.,* 957 A.2d 281, 289 (Pa.Super.2008) (citing *Viso v. Werner,* 471 Pa. 42, 369 A.2d 1185, 1188 (1977)), and "[w]hen [it] enters into a contract, it does so only on behalf of its separate, fictional capacity, *unless the contract or circumstances explicitly state otherwise.*" *Id.,* at 290 (citing *Electron Energy Corp. v. Short,* 408 Pa.Super. 563, 597 A.2d 175 (1991), *aff'd,* 533 Pa. 66, 618 A.2d 395 (1993)) (emphasis added). Thus, an agreement exculpating a corporation does not necessarily exculpate its employees, absent explicit language to the contrary, and I would hold that Camelback's employees were not covered by this release.

Justice BAER, concurring and dissenting.

I join the majority in concluding that the release at issue in this case encompassed Camelback Corporation as well as Brian Monaghan, its employee. Thus, I join fully the Court's reversal of the Superior Court's opinion in this regard. As to the majority's analysis concerning whether a release of reckless conduct violates public policy, because I believe the issue of reckless conduct is not before this Court, and assuming *arguendo* that it is, believe further that the trial court neither erred as a matter of law nor abused its discretion in concluding that no genuine issue of material fact exists regarding whether Monaghan engaged in reckless conduct, as opposed to ordinary negligence, I would not analyze the public policy issue. Rather, I would reverse the Superior Court's judgment and reinstate the trial court's decision granting summary judgment.

As noted by the majority, this case arose out of a snow tubing accident. Plaintiff and her family chose to snow tube

on Camelback's family slopes where customers are discharged down the hill from the top of the snow tube run by a Camelback employee. On this day, Monaghan was working the family slope Plaintiff was using, and was responsible for sending tubes down the hill once the prior customer had cleared the bottom of the snow tube chute.

In relevant part, Plaintiff sued Camelback Ski Corporation and Monaghan, alleging in her complaint that she was injured as a result of Monaghan's negligent and/or reckless conduct in operating the tube chute. Specifically, in her complaint, she claimed that while walking off the snow chute following her completion of a run, she was struck by another snowtuber coming down the chute. She set forth that "despite the obvious collision," Monaghan continued to send customers down the chute. Additionally, she pled that "Monaghan failed to look to be sure that the chute was clear before sending another tube down the chute." Plaintiff's Complaint at 2 ¶ 8. As a result of Monaghan's alleged negligent and/or reckless conduct, Plaintiff asserted that she suffered serious and severe personal injuries.

Following discovery, which included the depositions of both Plaintiff and Monaghan, Camelback and Monaghan filed a motion for summary judgment. They conceded for purposes of their motion that Monaghan engaged in negligent conduct when he "failed to look to be sure that the chute was clear before sending another tube down the chute," *id.* However, they maintained that they were relieved of any liability for Plaintiff's injuries by virtue of a release signed by Plaintiff, and through Plaintiff's purchase and receipt of a snow tubing ticket, which likewise contained a release of liability.

The trial judge granted the motion for summary judgment. The court concluded that Plaintiff released Camelback and Monaghan from liability for Monaghan's alleged negligent conduct and, therefore, she could not maintain a cause of action against them. The court further rejected Plaintiff's assertion that Monaghan's conduct in sending the next snow tube down the chute before Plaintiff had exited was reckless conduct not covered by the release. In this regard, the court

noted that reckless conduct constitutes a degree of action that is greater than negligence. Citing to the Restatement of Torts (Second) § 500, Comment g., the trial court set forth the following passage regarding reckless conduct:

Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.... The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

Trial Court Opinion at 12.

The trial court noted that in Monaghan's deposition, Plaintiff's lawyer specifically asked him whether he knew it was wrong to send another tube down the snow tube chute before the prior customer had exited, and Monaghan responded as follows:

A:   Yes. I mean, I wasn't doing it on purpose. I didn't do it on purpose to intentionally hit the lady. I just wasn't paying attention. I was focusing on other things. I was thinking about other things.

Deposition of Brian Monaghan, Oct. 25, 2005 at 16. Based upon Monaghan's deposition testimony, which constituted the only discovery regarding Monaghan's conduct relied upon by Plaintiff in her motion for summary judgment, the trial judge concluded that the evidence supported a finding that Monaghan was negligent; however, the court further concluded that "there is no suggestion that Monaghan was aware that [Plaintiff] was still in the chute and sent the tube down anyway." Trial Court Opinion at 12. Thus, the trial court concluded that Plaintiff failed to create a genuine issue of material fact

as to whether Monaghan engaged in reckless conduct. Accordingly, the court granted the motion for summary judgment.

Plaintiff appealed to the Superior Court. Initially, a three judge panel issued a memorandum affirming the trial court. The court found that the release signed by Plaintiff was valid and absolved Camelback and Monaghan from liability for negligence. With regard to the question of whether the release, likewise, absolved the defendants from reckless conduct, the panel noted that, as determined by the trial court, Plaintiff failed to produce evidence creating an inference that Monaghan acted in an intentional, reckless manner. Further, the panel opined that, even assuming reckless conduct on the part of Monaghan, the release was sufficient to cover such conduct, noting that its language released defendants for negligence and "other improper conduct." Thus, the court affirmed the trial court's decision.

Plaintiff sought rehearing of the Superior Court's panel decision before an *en banc* court, which was granted. The *en banc* court disagreed with the panel decision, and reversed the trial court in a published decision. *Tayar v. Camelback Ski Corp.*, 957 A.2d 281 (Pa.Super.2008). The court noted the following issues that were raised by Plaintiff on appeal to the Superior Court:

I. Is a personal injury claim barred where (a) the resort's release identified the expected risks of snow tubing as common physical conditions of the premises and conduct of the snow tubers, neither of which caused plaintiff's injuries; and (b) her injuries were caused by an employee's unexpected wrongful acts which caused a dangerous situation that was not supposed to exist on the family tubing chutes?

II. Is a claim for injuries caused by the reckless and/or grossly negligent acts of an employee barred by a release which (a) did not mention any wrongful acts of the resort's employees in its list of the common and expected risks of snow tubing; and also (b) did not say anything about the employees' reckless or grossly negligent acts?

III. Is suit against a ski resort's employee for his wrongful acts barred where .(a) the release named "Camelback Ski Corporation" as the sole released party; (b) the only mention of releasing "employees" was in small print at the bottom of a folded ticket the injured party had not read or signed; (c) the ticket stated that the snow tuber "agrees to accept the risks of snowtubing" listed in the ticket, but the accident was not caused by one of the expected risks of snow tubing; (d) the accident was caused by the employee's unanticipated wrongful acts, which created a dangerous situation that was not supposed to exist; and (e) the ticket only talked about suing "regardless of any negligence of Camelback or its employees" and did not mention recklessness or gross negligence?

*Id.* at 284–5.

These issues, as framed, assume the presence of reckless conduct and then question whether such conduct is covered by the release at issue in this case. Plaintiff, however, never raised, as an issue in her brief to the court, whether the trial court erroneously concluded that she failed to create a genuine issue of material fact regarding whether Monaghan's conduct constituted recklessness. Notwithstanding this omission, the *en banc* court found that a material question concerning this fact did exist. The court further found that the release encompassed only negligent conduct because its language was not specific enough to release acts of greater culpability. Finally, the court determined that the release applied to the negligent acts of Camelback, but not Monaghan. Accordingly, the court reversed the trial court's grant of summary judgment and remanded to the trial court for further proceedings on the question of whether the defendants' conduct was reckless or intentional, and if so, whether such conduct caused the injuries to Plaintiff.

In my view, because no specific issue set forth in Plaintiff's brief challenged the trial judge's conclusion that plaintiff failed to raise an issue of material fact regarding Monaghan's alleged reckless conduct, further review of that question on appeal was not appropriate. *See Wiegand v. Wiegand,* 461

Pa. 482, 337 A.2d 256, 257 (1975) (holding that the Superior Court erred by *sua sponte* deciding an issue that was not raised by the appellant and, therefore, exceeded its proper appellate function of deciding controversies presented to it). Accordingly, the Superior Court, and this Court in turn, had no basis to address whether the release sufficiently covered reckless conduct or whether it is a violation of public policy to release someone from reckless conduct, where, as here, Plaintiff did not present evidence to create a factual dispute regarding Monaghan's alleged recklessness.[1]

Even assuming *arguendo* that Plaintiff had preserved the issue concerning whether Monaghan's conduct rose to the level of recklessness, I would reverse the Superior Court and affirm the trial court's grant of summary judgment to Camelback and Monaghan. Summary judgment may be granted under Pa.R.C.P. 1035.2 where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 468–9 (1979). Summary judgment is properly entered where the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits demonstrate that no genuine, triable issue of fact exists and that the moving party is entitled to a judgment as a matter of law. *See* Pa.R.C.P. 1035.2. The burden of proving that no genuine issue of material fact exists is on the moving party and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 928 A.2d 186, 195 (2007). In response, the non-moving party may not rest upon the plead-

1. The majority notes that Plaintiff raised an issue regarding whether the trial court properly concluded that Monaghan's conduct was reckless in her response and brief in opposition to Appellants' motion for summary judgment and in her 1925(b) statement of matters complained of on appeal. The majority, likewise, points out that Plaintiff discussed the matter in her briefs to the Superior Court. Nevertheless, the issues set forth in her brief, as stated above, did not specifically or discretely challenge the propriety of the trial court's conclusion that no genuine issue of material fact regarding recklessness was established by Plaintiff. Instead, in my view, the questions, as presented, simply assumed reckless conduct, and then questioned whether the release at issue was sufficient to cover such conduct.

ings, but must set forth specific facts demonstrating a genuine issue for trial. *Phaff v. Gerner*, 451 Pa. 146, 303 A.2d 826 (1973). An appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. Whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo. Weaver v. Lancaster Newspapers, Inc.*, 592 Pa. 458, 926 A.2d 899, 902–03 (2007).

Again, here, the trial judge concluded that no genuine issue of material fact existed regarding whether Monaghan's actions constituted reckless conduct. Applying the appropriate scope of appellate review to the trial court's decision, I do not believe the court abused its discretion or erred as a matter of law. Our decision in *Phaff v. Gerner*, 451 Pa. 146, 303 A.2d 826 (1973), as well as Pa.R.C.P. 1035.3, make clear that once a motion for summary judgment is made, the non-moving party may not rest upon the mere allegations or denials of the pleadings, but must show through other evidence that a genuine issue of material fact exists. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Id.* (citing F.R.C.P. 56, Notes of Advisory Committee on 1963 Amendment, 28 U.S.C. 416).

Here, Plaintiff's pleadings alleged that Monaghan's conduct rose to the level of negligence and/or recklessness. The only discovery submitted by Plaintiff to support these allegations was the deposition testimony of Monaghan. As noted, Monaghan testified that although he was not paying attention when he sent a snow tube down the chute before Plaintiff had time to exit, he did not do so intentionally. Defendants then filed a motion for summary judgment, conceding that the testimony of Monaghan demonstrated negligence, while implicitly indicating that it failed to support Plaintiff's allegation of recklessness, which required a higher quantum of consciousness and risk on the tortfeasor's part. *See* Restatement of Torts (Second) § 500, comment g. The trial court, thereafter, concluded that the pleadings and supporting discovery in the case demonstrated that no genuine issue of material fact existed re-

garding whether Monaghan's conduct was reckless. In my view, the court neither abused its discretion in so concluding, nor erred as a matter of law in making this conclusion.[2]

Based on the foregoing, I would reverse the Superior Court's decision and reinstate the trial court's order granting summary judgment finding, first, that the issue of whether Monaghan's conduct was reckless is not properly before us, and, second, finding that even assuming *arguendo* that the issue was properly before us, the trial court was correct in determining that Plaintiff did not create a genuine issue of material fact regarding Monaghan's alleged recklessness.

2. The Superior Court, in reversing the trial court's conclusion that there was no factual question regarding reckless conduct, an issue not specifically raised by Plaintiff on appeal, noted that the trial court erroneously based the entry of summary judgment on the deposition testimony of Monaghan, citing to the rule of *Nanty–Glo v. American Surety*, 309 Pa. 236, 163 A. 523 (1932), that a moving party may not rely exclusively on oral testimony to establish the absence of a genuine issue of material fact. The moving party here, however, did not rely on or present the deposition testimony of Monaghan to support its motion for summary judgment; rather, Plaintiff introduced the deposition to support her allegation that Monaghan's conduct was reckless. Thus, the Superior Court's determination in this regard was improper.